James Skinner v. Joshua Larson, Abilene, Ronald, Skaga Mr. Skinner, good afternoon. May it please the court, I'm Jim Skinner and I'm the attorney for Gail Larson in this partition case. I thank you for the opportunity for me to be heard today. I just briefly want to go back through the facts quickly because I think it's these partition cases, as the court knows, the law is not real clear and a lot of these cases are really, really old and these terms remain undefined and I think the facts are important. Just briefly, Gail Larson and Dale Larson were brothers who were raised on this farm, which is the subject of the partition action. They inherited from their mother. When this case was filed, well, slightly before the case was filed, Dale Larson executed a quit claim deed in which he conveyed his interest in the farm to his children, four of which were out there, but he reserved a life estate in himself. Then shortly after the case was filed, he died, Dale died, leaving the four children as the owners of an undivided one-half interest in this property. Shortly thereafter, within a few months, my client then buys three of the four children's interests, leaving him now owning seven-eighths of the 160-acre farm and Joshua Larson owning one-eighth of the farm. It's important to point out that Gail was raised on the farm. Josh, at some point during this litigation, who's the remaining defendant, moved into a camper-type structure on the old farmstead and I want to clear up, I should have used a better word in my stipulation of facts and in my argument, I used this word homestead and I really wish I wouldn't have done that because I don't intend for homestead to mean, I don't think any of the parties meant for homestead to mean homestead pursuant to the statute or a homestead exemption. What I really should have said is farmstead and as I prepared for this today and I read the cases again, I thought, boy, that was not a very articulate way of saying that. I should have said farmstead. And in any event, Josh lived out there, he says, in a camper with no running water, no sewer, no electricity during the pendency of this litigation. And I think that had some effect on the judge's opinion when he reads his letter, which we have a problem with. Early on in the litigation, Herb Meyer, who's an appraiser, was appointed to be the commissioner in this case and Mr. Meyer first prepared a report prior to the sale of the three children to my client. So that report kind of went out the window because things changed and now we're down to a 7-8s and 1-8s so I don't think that's really relevant to our appeal, but it did happen. Later, I think it's February, in February of 2009, he updates his report to reflect the current ownership interest in the property. And as you know, we're here today because we have a lot of objections to that report, how it was done and what his frame of mind was when he did it and also to the court adopting one of the options in that report. And I'm sure you've read, it's very lengthy and it's in the appendix and I'm sure you've seen it, but when you start talking about the options that he provided, they are diametrically opposed to each other as far as who would get what. I mean, in one option, which is the 143-17 option, that 17 acres is Class A farmland all tillable and then the 143 is a mix of everything, including the old farmstead. The other option, which is the 135, I think I use it 135 or 134, and the reason is it's a fractional interest. It's like 25 point something and 134 point something, so it may be in the record a little bit. Sometimes saying 135, sometimes saying 134, but that's why, because it's really in between. In that case, the 25 acres encompasses the farmstead and mostly timber ground. An important point that I think I've made in my briefs and I want to make again today is that both parties, both Josh and Gail, the plaintiff and defendant, both have stated that they had interest in, they wanted to receive the old farmstead. They both did and they both claim to have emotional ties with their Gail being raised there and being in the farm and family and Josh wants to be there too. I think that's an important point here. When I look at how it was divided and what Herb Meyer's state of mind was, I think one thing that's important to this court is his letter to the judge of June 21st of 2011, which is in the record at C-123, and he tries to define manifest prejudice in that letter. He says, and I'm paraphrasing slightly, but it's an intentional effort to act with prejudice. I would submit that the case law, I think both Mr. Stonewall and I have done a lot of research on this issue, I can't find manifest prejudice defined by a court in the state. I mean, I cannot find it. The only definition I can find is from Black's Law Dictionary, which I've stated in my brief. I don't think that's right. I don't think you have to intentionally try to prejudice one party. I think it just has to have the result of one party getting something that is different than the other party got. I mean, different is probably not the right word. It's one party getting something that is manifestly different than what the other party got. In addition, Meyer's in that record, in that letter on the 21st of June states, it's my understanding my duty is to provide the court an analysis of the possibility of defining the property as equitable as possible. When you look at his reports, I mean, and he does, in mid-trial he prepares another report, which is a 21-40 split that the judge didn't use, and I think that's in the record. It appears, based on these three different options, that his opinion, and I think that's supported by this letter, his opinion is, I have to divide this property somehow. I don't have, I'm not going to sell it. I have to find a way to divide this property. And it looks, the strong evidence of that is the fact that he provides these different options, which are diametrically opposed to each other. I mean, they aren't, there's no way to split the baby here. I mean, that's what he's done. It really appears he gave no thought to trying to divide the property. And the last thing, going back to this letter, and I hate to harp on this too much, but it concerns me a lot because I do think this little fact kind of underlies a lot of what happened in this case. At the end of it, he has this quote saying that there are economics factors underlying this case that maybe one party has an economic advantage over the other. And I do think that there's a perception that my client has the ability to buy this and sell it. It may be true. I'm not saying it's not. But I've cited to a case, Davis v. Davis, which says the motives of a party in seeking partition cannot be considered by the court. And I'm concerned that there is this impression by the trial court and the commissioner that, well, Gail's going to buy it, and so he's going to win. I don't think you can consider that. Maybe it's true. I'm not saying it's not true. It might very well be true. But I don't think a court can consider that and say, well, you can't, I'm going to give this property to Josh that both people want because Gail's going to buy it. I don't think that's a fair, I think there's an impression out there that that's what's going on. As I stated, the cases don't provide a good definition about what this manifest prejudice means. But I do think there's a little bit of instruction in some of the cases. In fact, I'm even citing some of the cases that the defendant has cited to him, specifically Harris v. Johnson. First thing they state that I think is important in my case is that they acknowledge that a division of property into small parcels may at times work to prejudice the parties. It may very well do that. In that case, though, what's really important is the court ended up dividing the property, but the facts of that case really show that there was no real option for the court because in that case the people co-owned, I believe it was Lot 19, the plaintiff and defendant, they each owned lots on the side of Lot 19, but there's a garage that's partially on Lot 19 and partially on one of either the plaintiff or defendant's, I don't remember which, property. Like 20% is on one of their properties, 80% is on the property they co-own. So if you sell this, the garage has no use to either party at that point. So they really had no choice. It was a perfectly logical decision of the court to divide that and give ality to the other party to replace the garage. That's exactly what they did. That's not what we have here. We have a situation where we gave a farmstead to one party despite the fact that both people wanted it, and the equities in that are clear. If you use the commissioner's report and do the numbers, the farm that was awarded to Gale, the Tillable portion, is appraised for about $7,100 or $7,200 an acre. I wrote it down here. $7,200 or $6,700 an acre is what Gale's was, and what was given to Josh was $4,500 an acre, a little bit more. So it's not a situation where it had to be divided, and it's not a situation where the division was equitable. Additionally, both my witness, Mr. Young, whose transcript of his testimony is in the record, and Mr. Myers stated that they're not alike in soil types. You can see that from the commissioner's report. It shows the soil types. They're not alike in income potential. There's basically no income potential on the 25 acres, and so they're not alike at all. If you go and look at a case cited by the defendant, which is the Donaldson Supreme Court case, that's another case where they divided it. But when they analyzed what the commissioner did in making his division, they state, there's a quote in there, and it says, this whole tract contained about 50 acres of high land and 65 acres of medium and low land. The court allocated to the parties both high and low land and took into account the highway and railroad frontage. Not what happened here. The farmstead goes to one party, all the tillable land, not all, but the vast majority of the tillable land goes to the other. It's pretty apparent that in this case, these divisions are not equitable, and they do manifest a prejudice, the right of Mr. Gaylarson to his interest in the farmstead. There's no doubt that both the parties have emotional attachment to this farmstead. But again, as I stated previously, you can't split the baby. I mean, once you get, you can't give somebody, you shouldn't give somebody. If both parties want part of land, and there's a proceeding where you can fairly sell it, you shouldn't give one party what both parties want and give the other party something else. I think that is manifestly prejudiced in this case. And I go back and close into the old adage I think is very clear, and I cite it to a case in my brief about it. Real estate's unique. It is unique. And money, I mean, each party wanted a unique part of this real estate. And once, the uniqueness is what makes it prejudicial. I mean, the farmstead is something that's been in their family for years. If you give it to one party over the other, it's prejudicing the other party. You can't replace it. You can't go buy the farmstead again. You can't do it. And so the fact is that when you give that to one party, you've prejudiced the other. And I think that that is inherently what happened here, and I don't think it was equitable, nor do I think, and I think the rights of Mr. Gaylarson are prejudiced in this division. Do you think that in that circumstance, to sell it would be to prejudice both? So is that the only way to resolve a situation like that? What you're saying is that if both people want one portion of a tract of land, that in all circumstances they have to resolve it by sale? Well, I would never say all circumstances ever. But I think in this case specifically, I think that's the only fair thing to do. Like I said, you can't split the baby. I mean, you can't cut the baby in half in this case. The only thing you can fairly do is sell it and let it go where it may. I mean, I certainly think there could be lots of reasons why you would ignore people's claims that they both want something, because somebody could do that on purpose to make it be sold. I mean, clearly that could happen. I'm not foreclosing that possibility. I don't think there's any evidence here. I think both parties are sincere in their desire for that part of the land. I don't think there's any doubt about that. I can certainly see circumstances where there's a contrived attempt by one party or the other to claim some part of the land to get it sold. And so I would never go so far as to say it always has to. But I think under these facts, it should have been sold. Thank you. Mr. Strombaugh? Good afternoon. Good afternoon. My name is Ron Strombaugh, and I represent Josh Carson, and he is the owner of the undivided 1-8 interest in the land that we are discussing today, if it may please the court. I think in any kind of ñ in any partition suit, we deal first with the proposition that if a division can be made in kind, that's the preference, and that's supported both by the case law and by the statute in Illinois, and there are several cases that are cited in the briefs that set that out. And even an unequal division with loyalty is preferred over the sale of the premises. And that's what the trial judge did in this case in the end, is he selected one of the proposals of the commissioner and then equalized their interest by ordering a cash payment to do so. The ñ I'd like to deal a minute with Mr. Skinner's idea that the commissioner didn't realize what his duties or wasn't doing what he was supposed to do in this case. And he's referred to the stipulated letter that is contained in the record from Mr. Meyer. And as would be, I think, typical in any case, when Mr. Meyer was appointed as commissioner, which was by order of the court, which was, you know, approved by both of the parties, he was then supplied copies of the statute relating to partition matters by the parties. And so he undertook his duties with that in mind. And I think when he went out there, he had a general understanding of his duties as commissioner, and I think that would be true of anybody who was given that type of an assignment. He had served as a commissioner in one case previously, and, you know, the defendants expert, Mr. Young, had also served as commissioner in cases previously. But Mr. Meyer went out, he actually walked the farm. He viewed the farm on other occasions. And, you know, he reviewed the aerial photos and the soil surveys, and then he submitted a detailed report to the court with these alternatives. And the commissioner didn't say particularly to the court, I think this is how it needs to be, has to be divided. But he did say to the court, this property is capable of division, and it's capable of division in more than one manner. So when the judge looked at that and listened to the testimony in the case, he concluded that this proposed Division I made the most sense. And he stated his reasons for that, and those reasons were essentially that that division allowed the plaintiff in this case most of the tillable ground. Well, that made sense because the plaintiff in this case had other farmland. He was engaged in the business of farming, where my client was not a farmer, but simply resided on that ground. So that was one of his reasons. The other reason was that my client had also not only had the camper here, he was over-the-road truck driver, so he wasn't there all the time, but when he was in town, that's where he lived, in that camper on this property. But he'd also erected a garage on this property, and he'd spent several thousand dollars doing that. So the court had some basis for selecting this particular division of the property. So, and I think the case law in these types of cases are that, you know, the commissioner should have a great deal of discretion in their report, unless it's manifestly irregular or wanting an equitable distribution and shouldn't be disturbed. And that's stated in the case of Joseph v. Joseph, which is cited in our briefs. So I think the commissioner, and if you look at the commissioner's stipulation, and where he explains to the court what he did and his reasons for doing it, I think it's clear there that the commissioner had a general understanding of what he needed to do under his duties as the commissioner. And I think that's all we can ask of any commissioner in the case. And then, really, it's the judge that takes over from that point, and the judge has really superintending powers over the commissioner to direct the partition process and make the decision not only is the property capable of division, but is the property, should there be an equalizing payment. And in this case, the judge decided that those were both applicable and made the decision. Mr. Skinner also dealt with the issue of the homestead. And I think the fact that both of the parties expressed a desire for the homestead, I don't think that should be determinative of this case. It is the kind of decision that judges have to make every day. People want the same things, and that's what lawsuits are made of a lot of times. And the judge indicated in his letter ruling, which is located on C-127 of the transcript, he says, lastly, the fact that both parties have the desire to have the homestead area does not constitute manifest prejudice. If that were the case, a partition in kind could never be had when more than one party expresses a desire to be awarded a particular part of the subject property. And I think that's well-reasoned in the judge's opinion, and certainly a situation that this is a situation where the law requires that an equitable decision be made, but not necessarily an equal division. The trial court heard all the testimony in this case, and it certainly, especially I think in a case where there isn't a transcript, makes it difficult. But he decided that the property was capable of division, and that I think those matters are in the discretion of the trial court, and there isn't a reason to conclude in this matter that that was contrary to the manifest weight of the evidence in this case. And of course the court knows and realizes that all reasonable presumptions are in favor of the judgment of the trial court, and there just isn't a showing here that the trial court, or the commissioner for that matter, committed any reversible errors, and therefore we respectfully request that the judgment be affirmed. Any questions? Thank you, Mr. Standahl. Thank you. Mr. Skinner, any rebuttal? Yes. One thing I didn't say, I want to say, I do want to say is the commissioner never used that word manifest prejudice until that letter in June of 2011. He never used those words in his report. He never said that. He never said it could be divided without manifest prejudice. Secondly, importantly, and I forgot to say, is this line in Judge McClintock's letter that states that Gale is involved in farming is absolutely untrue. There's not one shred of evidence in the record, and it's just not true. Gale Larson is a postman. He hasn't farmed that farm in 20 or more years, so that is absolutely not true. It's not in the record. It was never testified to. And even despite it's not in the record, I'm telling you, as an officer of the court, he is not a farmer. And indicated of that, of what is in the record, is the stipulation regarding Dee Chandler. Dee Chandler is the farm tenant. He farms his ground, and he has for I don't know how many years, years, years and years and years, and he still does today. So that's just not true. He receives cash from his tenant in Solonet. Yeah. He owns a grain farm and gets cash for it. Yes. Yeah, Gale Larson just owns this farm. And so does Josh. I mean, they get whatever their interest is. So it would be 7, 8, 1, 8 they get in whatever the rent is. The second thing is about this garage. I don't know, garage may be a strong word. He built some kind of shelter out there. But Gale Larson never agreed. It says it's in our stipulation of facts. Gale Larson never agreed to him building a garage, never agreed to him living there at all. He just moved in there after Dale died. I don't know if moved in is a strong word, but had this camper over there after Dale died. I think to kind of parlay this I own 1-8 so I can put a camper over there and claim I live there into I should get that farmstead is quite a leap. And that's kind of what happened here. You parlayed this using this camper to getting the farmstead. And I also would like to point out that Gale was paying the real estate taxes during this time. And Mr. Stumble is right about judges dividing things every day. He's right about that. But in this case, it's a little different because we have a statute. And the statute provides for what he has to consider. And it provides you have to divide it equitably and without manifest prejudice to the parties. And we would say that his decision to do it that way manifested prejudices to the parties. Thank you. Thank you. I'm going to say something that I should have said at the very beginning, which is that there is a third member on this panel. Justice Holdridge will be participating in the discussion. He will be able to listen to the argument that you've made today. But unfortunately, the weather kept him from getting here today. But I did want you to know that he will have everything available that you have said and that we will be discussing and making the decision together, the three of us. Thank you very much for your arguments this afternoon. We will take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand at brief recess for a panel change.